**CFMT, INC. and CFM Technologies, Inc., Plaintiffs,**

v.

**STEAG MICROTECH INC., Defendant.**

No. Civ.A. 95–442–RRM.

United States District Court, D. Delaware.

Nov. 8, 1999.

Edward B. Maxwell, Josy W. Ingersoll, and John W. Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Edmund R. Pitcher, Douglas J. Kline, David C. Berry, and Stephen D. Whetstone, Testa, Hurwitz & Thibeault, Boston, MA, for plaintiffs.

Rudolf E. Hutz, Arthur G. Connolly, Jr., and Patricia S. Rogowski, Connolly, Bove, Lodge & Hutz, Wilmington, DE, G. Thomas Delahunty, Brooks Haidt Haffner & Delahunty, New York City, for defendant.

## OPINION

McKELVIE, District Judge.

This is a patent case. Plaintiff CFMT, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware. Plaintiff CFM Technologies, Inc. is a Pennsylvania corporation with its principal place of business in West Chester, Pennsylvania. CFMT is the assignee and owner of United States Patent No. 4,911,761 (the '761 patent), which was issued on March 27, 1990. CFM is the exclusive licensee under the '761 patent. Defendant Steag Microtech, Inc. is a Delaware corporation with its principal place of business in Austin, Texas.

On July 10, 1995, plaintiffs (collectively "CFMT") filed a complaint alleging that Steag infringed one or more claims of the '761 patent. The case proceeded to trial on issues of infringement, invalidity, and enforceability. On December 12, 1997, the jury returned its verdict. Among its findings, the jury determined that operation of Steag's Marangoni Dryer literally infringes claims 1, 8, 17, and 22 of the '761 patent. The jury awarded CFMT damages of $3,105,000.

Steag moved for judgment as a matter of law ("JMOL") on numerous issues, including infringement. On June 18, 1998, this court issued an Opinion denying Steag's motions on all issues except that of infringement under the doctrine of equivalents. *CFMT, Inc. v. Steag Microtech Inc.*, 14 F.Supp.2d 572 (D.Del.1998). On that date the court also enjoined Steag from making, using, or selling any such devices that infringe the '761 patent.

Steag appealed the denial of JMOL for no literal infringement. On May 13, 1999, the U.S. Court of Appeals for the Federal Circuit issued a decision affirming the ruling of this court in all respects except one. *CFMT, Inc. v. Steag Microtech, Inc.* 1999 WL 319505 (Fed.Cir. May 13, 1999). The appeals court questioned whether one claim limitation of the '761 patent, "replacing said rinsing fluid with said drying vapor," reads upon Steag's method which employs a mixture of 2.5% alcohol vapor and 97.5% gaseous nitrogen as an atmosphere. The appeals court vacated this court's judgment in part, and remanded the case for reconsideration of the issue of literal infringement of the claim in question.

On June 30, 1999, Steag filed a motion for a judgment as a matter of law that Steag's drying process does not literally infringe the '761 patent. Steag also moves to set aside the injunction and the damages award. On July 7, 1999, CFMT filed a motion for an order to reinstate this court's judgment of June 18, 1998. Both parties have completed briefing on the issues. This is the court's decision on the motions.

## I. FACTUAL BACKGROUND

The court draws the following facts from the testimony and evidence presented at trial.

### A. General Description of the Technology

The patent in suit relates to technology for washing silicon wafers during semiconductor processing. Wafer fabrication is a process that usually takes two to three months to complete, requiring that the wafer be repeatedly etched and implanted with circuitry. During wafer fabrication,

the wafers can often be exposed to contaminants and airborne particles, which can be detrimental to the wafers' microscopic circuits. Between each chemical processing step, the wafers must be washed and dried in a way that reduces the chances that any impurities or chemical residue are left on the wafer surfaces.

During this rinsing and drying process, a premium is placed on not only producing a clean and dry wafer, but on doing so in a way that reduces the chances of streaking or water marks. Streaks and water marks can interfere with the semiconductor's circuits in the same way as other contaminants. Rapid drying methods are preferred, since allowing water to simply evaporate can leave these streaks and marks.

CFMT began producing a "Full Flow" system for rinsing and drying silicon wafers in 1985. The system is an apparatus that pumps fluids into an enclosed vessel where the wafers remain stationary. The system allows fluids (gases or liquids) to flow past the wafers sequentially and continuously. The apparatus then drains the fluids out the bottom as new fluid comes in the top for rinsing or drying. The system is claimed in U.S.Patent No. 4,778,532 (the '532 patent), which was assigned to CFM Technologies, and which is not at issue in this case. CFMT optimized the performance of the drying process in the Full Flow system by modifying the equipment and optimizing various parameters, such as the speed at which the vessel drained, the temperature of the rinse water, the number of wafer carriers in the chamber, and the vapor pressure. On April 20, 1988, inventors at CFMT applied for a patent on this optimized process.

### B. *The '761 Patent*

The Patent and Trademark Office (PTO) issued the '761 patent on March 27, 1990. The specification of the '761 patent describes the claimed invention, with extensive discussion of the "drying vapor" that is the focus of the present dispute. The

specification states that isopropyl alcohol (isopropanol, or IPA) is the preferred chemical for use as a drying fluid. IPA, the specification explains, is economical, relatively safe (nontoxic), and forms a minimum-boiling azeotrope with water (an azeotrope is a mixture of two substances in such a proportion that they do not separate when boiled).

IPA, the patent continues, "has a tendency to break the harsh surface tension between the hydrophilic water and the relatively hydrophobic wafer surface." The specification explains that use of a vapor with the proper gas phase properties, such as IPA, can have a "tremendous impact" on the performance of the invention.

Once the IPA performs its water displacement function, the invention employs gaseous nitrogen to purge the isopropanol vapor from the vessel. The nitrogen purge removes any IPA residue from the surface of the wafers and displaces the IPA vapor from the vessel.

CFMT has asserted Claims 1, 8, 17, and 22 of the '761 patent against Steag. Claim 1, from which all the others depend, reads as follows:

> 1. A method for drying surfaces of objects which are suspended in a rinsing fluid comprising providing a drying vapor, replacing said rinsing fluid with said drying vapor by directly displacing said rinsing fluid from said surfaces with said vapor at such a rate that substantially no liquid droplets are left on the surfaces after replacement of the rinsing fluid with drying vapor.

### C. *Overview of Steag's Dryer*

Steag sells products useful for drying silicon wafers in the United States. Steag calls the product a "Marangoni dryer," as it allegedly exploits a chemical process known as the Marangoni effect.

To summarize the testimony of witnesses at trial, the Steag dryer comprises a rack of silicon wafers that hangs in a rinse bath of ultra-pure water. The device

uses a thin blade knife to slowly lift the wafers out of the bath. The apparatus continually pumps additional water into the rinse bath, such that water overflows from the tank, creating a current away from the wafer rack as the wafers are lifted into the atmosphere.

The apparatus uses IPA as a drying vapor. Nitrogen gas is bubbled through a bottle of liquid IPA, causing the IPA to evaporate into the stream of nitrogen. This gas stream, when saturated with IPA, comprises approximately 5% IPA and 95% nitrogen by volume. This stream, then, is mixed with a second stream of nitrogen in equal proportions, resulting in a gas stream that is approximately 2.5% IPA by volume.

The resultant gas stream is pumped steadily into the drying chamber. By a process whose details form the crux of this dispute, the IPA helps to remove water from the wafers as they are lifted from the rinse bath.

### D.  The Markman Hearing

On November 25, 1997, this court issued a Memorandum Opinion setting forth the court's construction of the disputed claims of the '761 patent. The Federal Circuit affirmed this court's construction of the claim language in question. *CFMT*, 1999 WL 319505, at *1. Following is this court's construction of the claim language relevant to the present dispute.

### 1.  "drying vapor"

The construction of the term "drying vapor" is important to the present dispute because Steag employs a diluted stream of IPA vapor, whereas the specification of the '761 patent describes a process using an essentially pure drying vapor. The court ruled that the term "drying vapor" means a vapor that facilitates the removal of liquid from a surface. The court expressly rejected Steag's proposed construction that limited the term "drying vapor" to a gas that is essentially pure and either saturated or superheated, as sug-

gested by language in the specification of the '761 patent. The court reasoned that dependent claims of the patent claim a method employing a drying vapor that is saturated, superheated, or an azeotrope. The court thus concluded that Claim 1, the independent claim, was not limited to essentially pure drying vapors.

### 2.  "replacing"

The dispute identified by the Federal Circuit largely turns on the construction of the term "replacing." *CFMT*, 1999 WL 319505, at *1. Claim 1 recites a method comprising "replacing said rinsing fluid with said drying vapor by directly displacing said rinsing fluid from said surfaces with said vapor." The court ruled that "replacing" in this context means "taking the place of."

### 3.  "directly displacing"

The term "directly displacing" is important to determining which drying mechanisms the '761 patent reads on. Of particular importance is the question of whether the '761 patent is limited to the displacement of water by drying vapor in its gaseous form, or whether the patent also covers displacement of water by condensed drying vapor. Steag argued in the claim construction hearing that the term "directly displacing" should require that the drying vapor directly displaces the rinsing fluid, without any substance, including condensed drying vapor, intervening between the rinsing fluid and the drying vapor. This court agreed that the term "directly displacing" precludes the use of an "intervening substance" between the drying vapor and the rinse water. The court declined to address during claim construction, however, whether IPA that has been adsorbed onto the surface of the bath or dissolved into the bath is an "intervening substance."

### E.  The Trial

### 1.  Steag's Defense to Infringement

Steag's defense to infringement, succinctly stated, is that it does not dry the

wafers with a vapor. Steag's witnesses asserted at trial that the IPA vapor employed in the apparatus becomes incorporated into the rinse water, wherein it activates a flow of water away from the wafer, pulling water from the surface of the wafer. The drying process is driven, according to Steag's experts, by the currents created by the Marangoni effect and by the overflow mechanism described above.

The Marangoni effect results from a surface tension gradient in a liquid. The concept of "surface tension" describes the attraction of liquid molecules at the surface of a liquid to molecules below. Water, which is highly self-attracted, produces a high surface tension. IPA, which has a lesser affinity for like molecules, has a lesser surface tension. The Marangoni effect is the phenomenon whereby fluid flows from areas with weak surface tension to areas with high surface tension. If condensed IPA is introduced in a relatively high concentration into a region of the rinse water, the surface tension of that region will drop, triggering the Marangoni effect, which drives fluid from that region into a region with a higher surface tension.

Dr. An–Ti Chai testified for Steag on how the Marangoni effect drives the drying process of the Steag dryer. He described that a "meniscus" forms where the water meets the edge of a wafer, with the surface of the water ramping up the wafer. The meniscus is thin, relative to the bulk of the rinse bath. The IPA vapor, which is carried into the drying chamber with the nitrogen flow, steadily becomes dissolved into the rinse water. The concentration of dissolved IPA becomes higher in the region of the meniscus, due to the slight volume of the meniscus. Dr. Chai testified that the IPA buildup in the meniscus invokes the Marangoni effect, which begins to drive fluid from the region of the meniscus to the bulk of the rinse bath. This movement is enhanced by the effect of the water overflowing from the rinse tank, which aids the flow of water molecules away from the wafer surfaces. Dr. Chai

stated that successful operation of the apparatus requires careful balancing of the inflow of IPA vapor, the outflow of rinse water, and the lifting rate of the wafer from the bath. According to Dr. Chai, "[t]he Marangoni flow, combined with overflow, sets up the continuous flow motion in the rinse bath, such that if you raise or withdraw the wafers carefully from the rinse bath, if you do not disturb that flow, you get clean and dry wafers from the rinse bath."

Dr. Chai further asserted that this process does not infringe the '761 patent, and particularly does not infringe the claim limitation of "replacing said rinsing fluid with said drying vapor by directly displacing said rinsing fluid from said surfaces with said vapor." Dr. Chai explained that there is no infringement of the claim because there is no gas or vapor displacing the rinse fluid from the wafer. According to Dr. Chai, the vapor and the liquid do not move relative to one another, so there is no displacement of liquid by gas.

### 2. *CFMT's Case for Infringement*

CFMT's argument, in brief, is that the IPA vapor, either in its gaseous state, or when adsorbed onto the surface of the rinse water, or once dissolved into the water, replaces water from the silicon wafers. CFMT asserts that although the Marangoni effect may contribute to the drying process, the Marangoni effect is insufficient to fully explain the drying process, and that, in any event, a dryer driven by the Marangoni process still infringes the '761 patent.

Dr. Robert Charles Helms and Dr. Srini Raghavan testified as expert witnesses for CFMT. Both witnesses stated that IPA contributes to the drying of the wafer through several physicochemical mechanisms. First, according to the witnesses, the IPA acts in the vapor state, displacing water molecules from the wafer when the wafer is lifted from the bath. Also, they testified that the IPA becomes adsorbed onto the surface of the water and performs

the displacement function at the immediate junction of the liquid, air, and wafer. And, the witnesses stated that the IPA becomes dissolved into the rinse water and displaces water from the wafer in the liquid state. On cross examination, Dr. Helms agreed that the Marangoni effect may contribute to the functioning of Steag's dryer. Dr. Helms, however, testified that "it is incorrect to rely on the Marangoni effect in its totality to describe the operation of the Marangoni Dryer."

Dr. Helms testified that, regardless of the exact mechanism by which the IPA functions, the IPA is performing a replacement operation by displacing water from the surface of the wafer. When asked on direct examination whether the Steag Marangoni Dryer replaces the rinsing fluid with the drying vapor, he replied:

Absolutely.

. . .

As the wafer comes out, the IPA has a much higher affinity for the surface than the water does. So you can think about that as a chemical force that is pushing the water down off of the surface. If you didn't have the IPA there, you would have a lot of droplets. Well, this IPA is getting on the surface and it is pushing down.

. . .

And so that is a description, at least in general terms, of how that displacement is taking place, where the IPA, in fact, probably just at the atomic level, in some cases, is displacing the water away from that surface as it comes out of that rinse tank.

Dr. Raghavan similarly testified that the IPA used in the Steag process performs the drying function despite its diluted concentration in the device's atmosphere. According to Dr. Raghavan, even though the IPA concentration is only 2.5% by volume in the bulk atmosphere, this is a significant concentration of IPA without which the dryer would not function. And in the meniscus, where the replacement action allegedly occurs, the IPA concentration is "much higher," according to Steag's promotional material that CFMT introduced into evidence.

Dr. Helms described the complexity of the surface of the silicon wafers. The wafer fabrication process etches circuitry channels into the wafers. According to Dr. Helms, cleaning the water from these channels "is probably a more critical cleaning application than just the bare wafer itself." Dr. Helms opined that gas-phase IPA, or IPA adsorbed onto the surface of the water, may be responsible for cleaning water molecules from inside these channels. He testified that the IPA:

has to be able to displace the water that is caught in those channels. . . . And so you can think about the IPA, either that maybe a molecular layer on the surface or the IPA that is right next to it in a gas phase working its way down those channels and actually displacing water as that interface recedes down past the surface of the wafer.

The IPA molecules that perform the cleaning operation, according to Dr. Helms, may be in a layer of IPA just one molecule thick.

### 3. The Jury's Verdict and the Court's Post–Trial Decision

Among other findings, the jury ruled that operation of Steag's dryer literally infringed claims 1, 8, 17, and 22 of the '761 patent. Steag filed multiple post-trial motions, including a motion for judgment as a matter of law that its dryer does not literally infringe the '761 patent. On June 18, 1998, this court denied Steag's motion on the question of literal infringement. *CFMT*, 14 F.Supp.2d at 572. This court enjoined Steag from making, using, or selling the accused dryer, and any other products covered by the asserted claims of the '761 patent. The court also ordered Steag to pay CFMT $3,105,000 in damages.

### F. The Federal Circuit's Opinion

Steag appealed, and the U.S. Court of Appeals for the Federal Circuit issued its opinion on May 13, 1999. *CFMT,* 1999 WL 319505 (Fed.Cir. May 13, 1999). The Federal Circuit affirmed the judgment of this court in all respects except one. The appeals court, noting that the atmosphere of the Steag dryer is composed of 97.5% nitrogen and 2.5% IPA, questioned the ruling of this court that the drying vapor of the Steag apparatus "takes the place" of the rinse fluid, as would infringe the claims of the '761 patent. Rather, the appeals court indicated that the evidence presented at trial suggests that the inert nitrogen, rather than the IPA drying vapor, is the predominant chemical entity "taking the place" of the rinse fluid. The appeals court declined to make an ultimate determination on the matter, and vacated this court's judgment and remanded the issue for further consideration.

### G. The Parties' Post–Appeal Motions

Both parties have filed motions with this court since the Federal Circuit issued its opinion. Steag has moved for judgment as a matter of law that it does not literally infringe the claims of the '761 patent, and to vacate the injunction issued by this court and the award of damages. CFMT, in turn, moved to reinstate this court's earlier judgment. CFMT, moreover, argues that Steag is precluded from moving for JMOL on the "replacing" issue as it allegedly failed to raise it in any post-trial motions. Both parties have completed briefing on the motions.

### H. Oral Argument on the Motions

Recognizing that the question raised by the Federal Circuit's remand to this court is a fact-intensive inquiry, this court issued a draft opinion to the parties on September 13, 1999 that articulated this court's understanding of the factual matters at issue as based on the evidence presented at trial. The court also invited the parties to move for a new trial or to present additional evidence in an evidentiary hearing. On September 21, 1999, the court held oral arguments on the draft opinion. The parties therein articulated their positions in relation to the court's interpretation of the facts. The parties also stated that the evidence in the record is sufficient to resolve the matter on the merits, and they declined to have a new trial on the issue or to conduct an evidentiary hearing to present additional evidence.

## II. DISCUSSION

### A. Waiver of the "Replacing" Issue

█ A party seeking to present issues on appeal must preserve the issues by raising them in post-trial motions. *See Biodex Corp. v. Loredan Biomedical Inc.,* 946 F.2d 850, 861–62 (Fed.Cir.1991). CFMT argues that Steag has waived its right to relitigate the issue of noninfringement under the "replacing" claim limitation because Steag allegedly failed to argue this point in its post-trial motions. Although claims must be properly preserved to be raised on appeal, this court finds no authority to suggest that Steag is precluded from relitigating the issue in question once an appeals court has specifically directed this court to reconsider the issue.

### B. Infringement Under the "Replacing" Limitation

█ The question before the court is whether a reasonable juror could have concluded that the "replacing" limitation of the '761 patent reads on Steag's accused process. If substantial evidence was presented at trial to show that the method employed by Steag comprises "taking the place of" the rinse bath with the IPA vapor, then this court is bound to uphold the jury verdict that Steag infringes the '761 patent. *See Litton Systems, Inc. v. Honeywell, Inc.,* 87 F.3d 1559, 1566 (Fed.Cir.1996).

### 1. There is no infringement if the drying displaces only a trivial amount of rinsing fluid

The '761 patent reads on those drying methods wherein substantially all water is removed from the surface of a wafer, and wherein this drying function is performed by a drying vapor "taking the place of" the rinsing fluid. As indicated by the Federal Circuit, the patent is not infringed by a process wherein the drying vapor replaces only a trivial amount of water, and wherein the replacement function is carried out predominantly by another substance. *CFMT*, 1999 WL 319505, at *2. Under the terms of the claim construction opinion, nitrogen cannot be construed as a drying vapor. In the Steag dryer, 97.5% of the bulk atmosphere is nitrogen gas, with only 2.5% of the bulk atmosphere consisting of IPA vapor. If, in the Steag method, the replacement function is performed predominantly by nitrogen, and only trivially by IPA, then there is no infringement. On the other hand, if the IPA used in Steag's device is the chemical agent that replaces a substantial amount of the rinsing fluid, then the patent is infringed.

### 2. A single replacement of water by IPA satisfies the "replacement" limitation

The "replacement" limitation requires that the drying vapor "takes the place of" the rinsing fluid. The "direct displacement" limitation requires that the drying vapor displace the rinse water prior to a displacement by any other "intervening substance." If the drying vapor of Steag's method replaces a substantial amount of the rinsing fluid, and there has been no displacement of water by an "intervening substance," then infringement is complete. Infringement is not obviated if another substance, such as nitrogen, enters the space previously occupied by the rinse fluid once the IPA has already substantially replaced the rinsing fluid from the surface of the wafer.

### 3. The physical state of the IPA at the time of replacement

There can be no infringement of the '761 patent by a drying method whereby an "intervening substance" displaces the water from the surface of the wafer before the drying vapor performs a displacement. The court, in its claim construction opinion, declined to rule whether IPA qualifies as an "intervening substance" when it displaces water from the wafer in a physical state other than vapor, such as when dissolved into the rinse bath or when adsorbed onto the surface of the rinse bath. Under the terms of the claim construction opinion, the jury had discretion to find that IPA "replaces" the rinsing fluid from the surface of the wafer even though the IPA performs this replacement function when adsorbed onto the surface of the rinse bath or when dissolved into the rinse bath.

### 4. The presence of IPA at the wafer/fluid interface

The parties do not dispute that there is IPA present at the interface of the wafer and the rinsing fluid in Steag's accused device. The parties present different views, however, detailing how IPA is physically present in this region.

#### a. IPA in the vapor state

The parties agree that vapor-state IPA is present in the atmosphere of the Steag dryer. IPA is introduced into the chamber at a concentration of roughly 2.5% IPA to 97.5% nitrogen gas, by weight. The IPA, as was admitted by Steag's expert, Dr. Chai, is distributed throughout the entire atmosphere. Because the atmosphere in the chamber is continually replenished with this IPA/nitrogen mixture, the court presumes that the concentration of vapor-state IPA in the atmosphere remains at approximately 2.5% by weight.

#### b. IPA adsorbed on the water or dissolved therein

The evidence indicates that IPA is also present on the surface of the rinse water, and dissolved therein. Both parties appear to agree that the IPA can "adsorb"

onto the water, and form a thin layer, possibly just one molecule thick, on top of the water. Dr. Helms, CFMT's expert, testified that there is a "high concentration of IPA ... adsorbed on the surface." Once the IPA adsorbs onto the surface of the water, it may become dissolved into the bulk of the rinse bath. Dr. Helms testified that the IPA can diffuse below the surface of the water, and that the thickness of the diffused region "would depend on the flow rates and the partial pressures and the details of the system."

Dr. Chai, Steag's expert, did not dispute that IPA adsorbs to the surface of the water or becomes dissolved therein. On the contrary, such adsorption and dissolution is critical to induce the Marangoni effect, Dr. Chai testified. Because IPA is miscible with water, the vapor-state IPA "quickly dissolves into the rinse water," Dr. Chai stated. Dr. Chai emphasized that the concentration of IPA in the rinse water is regulated to induce and preserve the Marangoni effect. As recited above, the Marangoni effect describes the flow of fluid from regions of low surface tension to regions of high surface tension. As IPA is introduced into a region of water, the surface tension in that region decreases. According to Dr. Chai, the concentration of IPA in the meniscus is higher than the concentration of IPA in the bulk of the rinse fluid for two reasons. First, the volume of the meniscus is slight, such that the buildup of IPA therein is rapid in comparison to within the rest of the rinse tank. Second, the flow of water, as induced by the overflow from the tank, is slow at the surface of the wafer. Given the slight volume of the meniscus and the relatively slow pace at which the water is drained away from the wafer surface, IPA accumulates in the meniscus to a concentration higher than in the bulk of the fluid. This concentration gradient, according to Dr. Chai, induces the Marangoni effect, and causes the fluid to flow away from the wafer.

Dr. Chai emphasized that the concentration of IPA must be regulated in order to preserve the Marangoni flow. The Maran-

goni effect, he stated, is a non-equilibrium effect that lasts only insofar as a concentration gradient is maintained across the fluid. If the atmosphere is saturated with IPA, he testified, the surface tension of the fluid is reduced uniformly, which serves to "kill the surface tension gradient." In order to preserve the gradient, Dr. Chai stated, the level of IPA introduced into the chamber must be regulated. When the IPA is originally carried into the stream of nitrogen, it comprises 5% of the gas stream by weight. The Steag process dilutes this stream by combining it in equal proportions with an inflow of pure nitrogen, resulting in an IPA concentration of 2.5%. In the Steag process, moreover, the rate of overflow from the tank is regulated to adjust the rate at which IPA is drained from the tank and to ensure that the concentration gradient of IPA remains constant. Dr. Chai stated that "the overflow is important to flush away the excessive IPA, to maintain the necessary surface tension gradient or the concentration gradient." The overflow, according to Dr. Chai, prevents the formation of a liquid layer of IPA on top of the rinse bath.

Dr. Chai further explained that the concentration of IPA in the rinse bath must be maintained at a relatively low level to properly dry the wafers. According to his testimony, it is beneficial to reduce the surface tension of the rinse fluid in order to eliminate the formation of droplets of water on the wafers when they are withdrawn from the rinse tank. He stated, however, that excess IPA will cause the surface tension to drop below an optimal level. When the surface tension is too low, he testified, the wafers cannot be rapidly withdrawn from the tank because the surface tension breaks, resulting in the formation of droplets on the wafer.

5. *What is the role of IPA in "replacing" the rinse fluid?*

a. *IPA adsorbed upon, or dissolved into, the rinse water*

The parties dispute the role that IPA plays at the interface of the wafer and the

rinse bath. According to Dr. Chai, the IPA is used only to induce the Marangoni flow. Dr. Chai stated that IPA is critical to the Steag dryer, and that absent IPA, the process would not produce dry wafers. Although the IPA is introduced as a vapor, and it is essential for drying the wafers, Dr. Chai stated that the IPA does not act "as a drying vapor, so to speak." The IPA, in his view, dissolves in the water to act as a surfactant and reduce the surface tension of the rinse bath, inducing the Marangoni flow. Steag presented no evidence to suggest that the IPA dissolved in the rinse bath interacts directly with the wafer. Rather, according to Dr. Chai, the IPA is continually flushed out of the rinse bath with the overflow.

CFMT's view is that the IPA dries the wafer directly. Dr. Helms testified that the IPA adsorbs to the surface of the bath, creating a high concentration of IPA on the surface of the water. He stated that IPA has a much higher affinity for the surface of wafers than does water, such that when a wafer is lifted from the tank, the IPA interacts directly with the wafer. He stated:

> Well, this IPA is getting on the surface and it is pushing down. It is almost like if you took a squeegee and you just squeegeed off the water to keep it in the tank and away from the surface as [the wafer] pulls out of the rinse tank.... [T]he IPA, in fact, probably just at the atomic level, in some cases, is displacing the water away from that surface, as it comes out of that rinse tank.

The IPA, he continued, pulls and keeps the water away from the wafers as they move out of the rinse tank.

CFMT emphasized that the IPA is critical for removing the water from the circuitry channels of the wafers. Dr. Helms emphasized that the surface of silicon wafers is complex, with minute circuitry channels etched therein. Removing the water from these channels, stated Dr. Helms, "is probably a more critical cleaning application than just the bare wafer itself." Ac-

cording to Dr. Helms, the IPA, either when adsorbed to the surface of the water, or in the vapor phase, can be seen as "working its way down those channels and actually displacing water."

CFMT also presented evidence to suggest that the Marangoni effect cited by Steag is insufficient to drain off the IPA from the sides of the wafers. Dr. Raghavan noted that scientific literature recites that the Marangoni effect is a very rapid process, wherein the velocity of the fluid being displaced ranges from one centimeter per second to fifteen centimeters per second. Dr. Raghavan, on cross-examination, stated that there is a "very good chance" that the Marangoni effect helps drain IPA away from the wafers. Dr. Raghavan explained, however, that the geometry of the dryer, coupled with the overflow speeds used, reduces the impact of the Marangoni effect. He noted that multiple wafers are dried simultaneously in the apparatus, and that the spacing between the wafers is "very, very small, on the order of a few millimeters." Given that only a small percent of the rinse fluid enters into the regions between the wafers, he testified, in order to "sweep away the IPA molecules which are coming at a fast rate from the surface," the apparatus would require a "much, much higher" overflow rate than the rate of 1.5 liters per second currently used.

### b. *IPA in the vapor phase*

The parties disagree on the way that IPA vapor interacts with the wafer. According to Steag, the vapor-state IPA does not interact with the wafer. In its vapor form, Dr. Chai testified, the IPA "just flows in and flows out, and doesn't do anything to the drying process."

CFMT, however, asserts that vapor state IPA directly contributes to the drying of the wafer. Regardless of how the Marangoni effect might influence the flows of water in the rinse bath, Dr. Helms testified, IPA vapor directly displaces wa-

ter from the wafer. Dr. Raghavan stated that, even though the IPA vapor has only a concentration of 2.5% by weight in the atmosphere, this is a significant concentration that is sufficient to perform the replacement function. Dr. Helms stated that IPA vapor might be especially important in cleaning water from the circuitry channels etched in the wafer, as discussed above.

### c. How much IPA "replaces" the rinse fluid?

The Steag device infringes the '761 patent only if the IPA employed therein replaces a substantial amount of the rinsing fluid from the surface of the wafer. As indicated by the Federal Circuit, if the IPA contributes to the replacement function only to a trivial extent, then there is no infringement.

The parties have presented conflicting evidence as to the physicochemical mechanism by which the water is removed from the surface of the wafer. Two undisputed facts lie in favor of Steag: 1) the concentration of IPA in the atmosphere of Steag's device is only 2.5%; and 2) the Marangoni dryer has an overflow mechanism that drains off the IPA, which presumably reduces the buildup of IPA at the wafer/water interface.

The evidence presented by CFMT, on the other hand, suggests that a sufficient amount of IPA is present in various chemical phases to carry out the replacement. Raghavan's testimony that 2.5% IPA is a significant amount of vapor, coupled with Helms' testimony that this vapor acts as a chemical "squeegee" that forces the water from the wafer, indicates that the reduced concentration of IPA vapor in the Steag device is sufficient to perform a replacement of the water. The testimony presented by CFMT also suggests that the IPA performs a replacement function when adsorbed onto the surface of the bath, or when dissolved into the bath. Raghavan's testimony indicates that, notwithstanding the possible action of the Marangoni effect, the rate at which the fluid drains from the bath is insufficient to flush the IPA away from the wafers.

The case was tried to a jury, and the role of the court in the present posture of this litigation is to determine if there is substantial evidence to support the jury's verdict of infringement. *Litton Systems, Inc. v. Honeywell, Inc.,* 87 F.3d 1559, 1566 (Fed.Cir.1996). The court should grant Steag's motion for judgment as a matter of law if the evidence "permits only one reasonable conclusion as to the verdict." *Id.* The court finds that the evidence recited above constitutes substantial evidence to show that the IPA does replace the water from the surface of the wafers in the Steag dryer, and that a reasonable jury could conclude that the Steag dryer infringes the '761 patent.

For the reasons set out above, the court will deny Steag's motion for judgment as a matter of law on the issue of literal infringement of the claims of the '761 patent, and its motion to vacate the injunction and the damages award. The court will grant CFMT's motion to reinstate the June 18, 1998 judgment. The court will issue an Order in accordance with this Opinion.